Filed 1/27/15  P. v. Diaz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C075831 |
| Plaintiff and Respondent, | (Super. Ct. No. MHO0303) |
| v. | |
| ELTON JUAN LUIS DIAZ, | |
| Defendant and Appellant. | |

Thirty-six-year-old defendant Elton Juan Luis Diaz appeals from an order extending his civil commitment as a mentally disordered offender (MDO).  He was originally committed to a state hospital as an MDO in 2004 following his conviction for assault with a deadly weapon with great bodily injury for demanding money from a store clerk, shoving the clerk, and hitting the clerk in the face with his fist.  His current diagnosis was for schizoaffective disorder, bipolar type, which played an "active role in his behavior, impairing his decision making," and antisocial personality disorder.  He

1

also had polysubstance abuse disorder for alcohol, methamphetamine, and marijuana use that was in remission.

On appeal, defendant contends there was insufficient evidence that he was currently dangerous and that his severe mental disorder caused serious difficulty in controlling dangerous behavior. We conclude the evidence was sufficient and affirm the trial court's order extending his commitment.

## DISCUSSION

" 'The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment . . . until their mental disorder can be kept in remission.' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061, disapproved on another point in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230.) "Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for . . . one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year.' " (*Lopez*, at p. 1063.)

To obtain an extension of one year, the People must prove that: (1) the person continues to have a severe mental disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) because of his mental disorder, the person continues to represent a substantial danger of physical harm to others. (Pen. Code, § 2972, subd. (c); *People v. Lopez*, *supra*, 50 Cal.4th at p. 1063; *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399.) Furthermore, an involuntary civil commitment requires proof that the person's mental disorder causes serious difficulty in controlling dangerous behavior. (*In re Howard N.* (2005) 35 Cal.4th 117, 122.) A mental health professional "may and should take into account the prisoner's entire history in making an MDO evaluation. This includes prior violent offenses as well as the prisoner's mental health history." (*People v. Pace* (1994) 27 Cal.App.4th 795,

799.)  We review for substantial evidence the MDO findings.  (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

Here, there was sufficient evidence of the two elements defendant disputes -- current dangerousness and serious difficulty controlling dangerous behavior caused by a severe mental disorder.  Dr. Michael Glasser, a staff psychiatrist at Napa State Hospital who treated defendant in 2011 and again in 2013, testified at the bench trial regarding extending defendant's MDO commitment.  Defendant's schizoaffective disorder, which is "not under control," "plays an active role in his behavior, impairing his decision making."  His "[i]nsight to the disorder is variable at times," as he still believes that other people can read his mind.  When asked about how treatment and medication help him, defendant stated, " 'it prevents you [from] acting out.' "  On some occasions, defendant has said that "while he's willing to take his medication, he doesn't feel he really needs to take it."  Dr. Glasser believed that this posed the risk that defendant would stop taking the medication that controlled his schizoaffective disorder and "act[] out," as defendant put it, because he did not "fully and completely recognize it's an absolute necessity" to keep his disorder under control.

According to Dr. Glasser, defendant "has a history of medication noncompliance, so without treatment to monitor his use of medications . . . he has a history of relapsing."  His history of relapsing included defendant's long history of substance abuse and mental illness leading to violent criminality, followed by institutionalization and release into the community, only to repeat that same cycle.  Defendant was a juvenile delinquent for committing "numerous offenses," including violating "the rights of others," and eventually ended up in the California Youth Authority after unsuccessful placements with his family and group homes.  He was diagnosed with schizophrenia at age 17.  He has " 'behaved violently in virtually every setting in which he has lived.' "  For example, while released on probation in a community residential program in 2012, defendant "was physically menacing and had verbal altercations with the female [b]oard and [c]are

3

operator and select peers" and was not "forthright" with his therapist "when confronted about these incidents." Within less than a year of being placed on probation, he was found " 'hanging out at a tattoo parlor,' " smelling of alcohol, and irritated and agitated. Upon returning to the state hospital, defendant had a brief stay on a less restrictive unit, but was returned to a locked unit for "difficulties attending his treatment activities."

Dr. Glasser believed that "based on [defendant's] history," "chances are not good that he would continue to follow through with expectations of medication and treatment unless supervised carefully." And defendant currently was only in a level 2 ward, which meant that the medications he needed to take both in the morning and at night to control his schizoaffective disorder were administered in a supervised setting and were being crushed so he would not sell them or divert them in another way (like snorting or injecting them). Only when defendant reached level 3 (which he had not) would he be allowed to take pills intact, demonstrating responsibility and a "critical step . . . in their transition . . . to the community."

This evidence was sufficient that defendant's schizoaffective disorder made him currently dangerous and that he had serious difficulty controlling dangerous behavior caused by a severe mental disorder.

## DISPOSITION

The order is affirmed.


                                                      _____ROBIE_____, J.

We concur:


_____HULL_____, Acting P. J.


_____MAURO_____, J.

4